**Carlos ROSADO, Plaintiff,**

v.

**Edward ALAMEIDA, Jr., et al., Defendants.**

**No. 03 CV 1110 J(LSP).**

United States District Court, S.D. California.

Dec. 8, 2004.

Cal.Rptr. 660.

**1342**

Aaron P. Arnzen, Byron Y. Yafuso, Cooley Godward, LLP, San Diego, CA, for Plaintiff.

Attorney General, State of California Office of the Attorney General, San Diego, CA, for Defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION IN PART AND DENYING IN PART

JONES, District Judge.

Before the Court is Plaintiff Carlos Rosado's ("Plaintiff") September 3, 2004 Motion for Preliminary Injunction. On July 23, 2003, Plaintiff, an inmate currently incarcerated at Centinela State Prison ("CSP") filed a civil rights action under 42 U.S.C. § 1983 alleging that various CSP and California Department of Corrections ("CDC") officials violated his Eighth and Fourteenth Amendment rights by failing to place his name on a liver transplant list and provide other necessary care for his life-threatening liver condition. (Compl.¶¶ 50–97.) By order dated September 3, 2004, this Court granted in part Plaintiff's *ex parte* Application for Temporary Restraining Order ("TRO"), requiring Defendants to provide Plaintiff with immediate medical attention. [Doc. No. 54.] Subsequently the parties stipulated to the TRO's conversion to a preliminary injunction. Plaintiff now requests that the Court issue another preliminary injunction ordering Defendant Edward Alameida, Jr. et al. ("Defendants") to ensure that Plaintiff receives evaluations at all liver transplant centers in California. Defendants oppose. An evidentiary hearing was held on October 4, 2004 at 10:30 a.m., at which time the Court requested supplemental briefing on various issues. On October 8, 2004, Plaintiff filed a First Amended Complaint ("FAC"), removing certain Defendants and adding CDC as a Defendant. [Doc. No. 82.]

All parties are represented by counsel. The Court has determined the issues presented herein are appropriate for decision without oral argument. *See* Civ. L.R. 7.1.d.1. For the reasons addressed below, this Court **GRANTS** the preliminary injunction **IN PART**.

### *Background*

The relevant facts as alleged by the parties are numerous and involve many dates. Defendants have lodged more than 1,800 pages of Plaintiff's Department of Corrections medical files. What follows is a general overview of the case's factual and procedural background.

Plaintiff was received at CSP in March 2000. (Opp'n at 2; Ex A, AGO927, 525–526.) A couple of months later, he began to experience severe abdominal pain. (Compl.¶ 18.) Soon thereafter, Plaintiff was diagnosed with hepatitis C and cirrhosis. (Pl.'s Mem. of P. & A. at 2, 4) On September 7, 2000, CSP Medical Records show, Plaintiff received treatment at the

CSP Gastroenterology Clinic. (Opp'n at 2, Ex A, AGO–98)

The parties disagree on the events occurring between September 2000 and January 2001. Plaintiff claims that he made several requests for treatment and all were ignored by Defendants. (Compl. ¶ 23.) Meanwhile, Defendants counter that Plaintiff repeatedly refused to be admitted to the CSP infirmary and refused to be transferred to the Corcoran correctional facility. (Opp'n at 3; Ex A, AGO–88.) Seeking to be transferred to an outside medical facility and placed on a liver transplant list, Plaintiff appealed CSP's denial to the third and final level. (Opp'n at 3; Ex A, AGO–29–30, 42–43, 88.) By February 2003, Plaintiff had achieved administrative exhaustion. (Pl.'s Mem. of P. & A. Ex. A)

Two months later, on April 4, 2003, CSP approved and Plaintiff received a partial transplant evaluation by Dr. Sammy Saab at the University of California at Los Angeles ("UCLA") School of Medicine. (Pl.'s Mem. of P. & A. at 5.) Dr. Saab reported that Dr. John Parsons at CSP had "done a very good job in terms of screening and providing [Plaintiff] medical care" and agreed to discuss Plaintiff's evaluation with the UCLA transplant committee. (Opp'n at 4; Ex. A, AGO–644–646) Ultimately, Plaintiff was not placed on the UCLA transplant list, because the institution had concerns about security issues associated with treating an inmate. (Arnzen's Decl. Ex. 10.)

On June 2, 2003, Plaintiff, proceeding *pro se*, filed his Complaint with this Court. The Complaint includes the following claims: (1) that denying Plaintiff medical care violates his Eighth Amendment rights; (2) due process and liberty violation under the 14th Amendment; (3) negligence; (4) intentional and negligent infliction of emotional distress; and (5) torts in essence. Cooley Godward was approved as pro bono counsel for Plaintiff on July 7, 2004. [Doc. No. 42.]

Plaintiff received a second transplant evaluation at the University of California at San Francisco ("UCSF") Medical Center on January 13, 2004, by Dr. Raphael Merriman, a hepatologist. (Reply at 4.) While there, Plaintiff's urine tested positive for marijuana. (*Id.*) After Plaintiff's case was discussed by the liver transplant committee, there was consensus that consideration of Plaintiff's transplant would be deferred. (Opp'n at 6.) Specifically, the committee noted that Plaintiff had not been entirely compliant with past physician recommendations to accept transfer to alternate medical facilities. (Opp'n Ex. A, AGO–1655.) Additionally, Dr. Merriman recommended that Plaintiff participate in a local rehabilitation program, cease smoking cigarettes, and discontinue his use of marijuana, alcohol and other substances. (*Id.* at AGO–1655–56.) Plaintiff argues that his rejection was at least in part motivated by security concerns, which Defendants did nothing to allay. (Pl's Mem. of P. & A. at 6.)

Since the visit to UCSF, Plaintiff has not been evaluated again for a transplant. However, Defendants have taken steps to arrange for a third evaluation at University of California at San Diego ("UCSD"). Plaintiff now seeks a preliminary injunction including the following instructions:

(1) Centinela staff physician will examine Plaintiff at least twice per month;

(2) treatment recommendations of staff physicians will be carried out unless unreasonable, unnecessary or refused by Plaintiff;

(3) all medications and dietary supplements prescribed by Plaintiff's treating physicians will be promptly and reliably provided to Plaintiff;

(4) Plaintiff receives complete evaluations at all California liver transplant centers, transportation to and from these centers, and illicit substance screening;

(5) Defendants will work with each liver transplant center to develop a security plan and provide security arrangements; and

(6) in accordance with the evaluations, Plaintiff will be placed on the liver transplant at those facilities, unless denied placement.

### *Legal Standard*

The Ninth Circuit recognizes two tests for determining whether a district court should grant a preliminary injunction. Under the traditional standard, a plaintiff must show: (1) a strong likelihood of success on the merits; (2) a possibility of irreparable injury should the injunction not be granted; (3) that the balance of hardships tips in his or her favor; and in some cases (4) that an injunction advances the public interest. *See Save Our Sonoran, Inc. v. Flowers,* 381 F.3d 905, 911–12 (2004) (citing *Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir. 1995)). Alternatively, the plaintiff may show "either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.*

It is well established that the two formulations both operate as a sliding scale, whereby a stronger showing of irreparable harm risk can compensate for a weaker likelihood of success. *See Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). Moreover, they are not considered separate tests; rather they are viewed as "outer reaches of a single continuum." *Id.* Under either test, the moving party bears the burden of per-

suasion. *Mattel, Inc. v. Greiner & Hausser GmbH,* 354 F.3d 857, 869 (2003).

### *Discussion*

### A. Likelihood of Success on the Merits

 The Eighth Amendment applies to medical treatment in prison. *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that prison officials have a constitutional duty to provide prisoners with necessary medical treatment). However, the Eighth Amendment does not protect prisoners from medical malpractice. *See McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992) (*overruled* on other grounds by *WMX Tech. v. Miller,* 104 F.3d 1133 (9th Cir. 1997)). Nor does the mere failure to provide medical care give rise to a constitutional violation. To recover for denial of medical treatment, the prisoner must prove: (1) the prisoner suffered from a serious medical condition; and (2) the prison officials were "deliberately indifferent" to the prisoner's medical needs. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In other words, the relevant inquiry involves both an objective and a subjective component. In the present matter, it is undisputed that Plaintiff's medical condition is serious. Therefore, this Court's analysis proceeds on the "deliberate indifference" factor.

 "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a section 1983 deliberate indifference claim." *Franklin v. Oregon,* 662 F.2d 1337, 1344 (9th Cir.1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989). In order to prevail on a claim involving

choices between alternative courses of treatment, a prisoner must show that the course of treatment the doctors chose was medically unacceptable in light of the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996). Prison officials must respond reasonably to a prisoner's medical needs. *See Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety, may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

In the present matter, Plaintiff contends that Defendants' refusal to make accommodations for him to be evaluated for, and ultimately placed on a list for, a liver transplant demonstrates deliberate indifference to his serious medical condition. However, in the more than four years Plaintiff has resided at CSP, Plaintiff has received extensive medical attention and he has been taken for transplant evaluations at two major academic medical centers—UCLA and UCSF. Therefore, this Court must ultimately determine whether Defendants' course of action was (1) reasonable and (2) medically acceptable in light of all circumstances.

A district court in the Northern District of Texas was recently confronted with a very similar case. *Campbell v. Martinez, et al.,* 03cv299, 2003 WL 22410576, 2003 U.S. Dist. LEXIS 23358 (N.D.Tex. May 14, 2003). There, a federal prisoner, diagnosed with hepatitis C and advanced cirrhosis, was denied in his request for a liver transplant and later brought a deliberate indifference claim *in forma pauperis.* (*Id.* 2003 WL 22410576 at *1, 2003 U.S. Dist. LEXIS 23358 at *1–2.) According to the plaintiff, the prison had chosen a less ex-

pensive course of treatment in response to institutional budgetary pressures. (*Id.* at 2003 WL 22410576 *1, 2003 U.S. Dist. LEXIS 23358 *5.) After denying the plaintiff's request for a preliminary injunction, the Texas court dismissed the action *sua sponte* for failure to state a viable claim. (*Id.* at 2003 WL 22410576 *1, 2003 U.S. Dist. LEXIS 23358 *2–3.) In rendering its decision, the court relied in part on expert testimony that the Bureau of Prisons had been unable to find outside medical facilities willing to contract for inmate organ transplants. (*Id.* at 2003 WL 22410576 *3, 2003 U.S. Dist. LEXIS 23358 *14.) Additionally, the court found that the plaintiff had advanced no facts to support his allegation that the prison's decision was based on costs. (*Id.* at 2003 WL 22410576 *3, 2003 U.S. Dist. LEXIS 23358 *12.)

In an earlier case, also involving a prison's refusal to schedule an inmate for a liver transplant evaluation, a New Hampshire district court dismissed the prisoner's deliberate indifference claim on summary judgment. *Dionne v. Brodeur,* 94–125–JD, 1995 U.S. Dist. LEXIS 17063 (D.N.H. November 8, 1995). The court relied in part on undisputed evidence showing that three physicians had concluded that the plaintiff was not a likely candidate for the transplant. (*Id.* at *11.) Additionally, the Court found that the plaintiff had failed to present any evidence indicating (1) that the defendants had acted with a constitutionally culpable state of mind or (2) that their medical conclusions were questionable. (*Id.*)

▮ While these cases are not binding on this Court, the Court finds that the issues they raise are relevant to the reasonableness determination. Such considerations include: (1) whether the transplant is medically necessary or whether alternative courses of treatment are avail-

able; (2) the prisoner's medical eligibility for a transplant; (3) the willingness of outside medical facilities to provide the necessary care; and (4) the cost of treatment. The Court will address Plaintiff's evidence regarding each issue in turn.

### 1. Medical Necessity

California law requires the CDC to provide inmates with medically necessary health care services, defined as those "that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care." 15 C.C.R. § 3350(a), (b)(3). Additionally, the United States Supreme Court has declared that states have an affirmative duty to treat the medical needs of those it incarcerates. *See DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

Here, Plaintiff contends that without a liver transplant his premature death is certain. In support, Plaintiff present the deposition testimony of CSP physician, Dr. Parsons. In August 2001, Dr. Parsons wrote in Plaintiff's progress notes that Plaintiff had a 50% chance of dying within 5 years and that a liver transplant is the only cure for such advanced stage cirrhosis. (Opp'n Ex A at AGO–067.) Additionally, in April 2003, Dr. Saab at the UCLA Liver Transplant Center diagnosed Plaintiff as someone "who essentially needs a liver transplantation as his life saving modality." (Opp'n Ex A at AGO–1612.) Defendants do not suggest that a transplant is not medically necessary, nor do they identify an alternative treatment that may save Plaintiff's life. Rather, Defendants illustrate how Plaintiff has received exten-sive medical care from CSP physicians, specialists and support staff throughout his four year incarceration at CSP. (Defs.' Supp. at 7.) Given that a transplant appears to be the only life-saving measure available to Plaintiff, Plaintiff demonstrates a strong likelihood of proving that a liver transplant is medically necessary.

### 2. Transplant Eligibility

In April 2003, CSP arranged for Plaintiff to be evaluated for transplant eligibility at UCLA Medical Center. (Pl.'s Mem. of P. & A. At 5.) After only a partial evaluation, UCLA denied Plaintiff placement on their transplant list due to the institution's security concerns, not because he was medically ineligible. (Defs.' Supp. at 6; Defs' Supp. Opp'n at 2.)

In January 2004, Plaintiff was presented for evaluation at UCSF. (Defs.' Supp. at 3.) According to UCSF's Dr. Merriman, in deciding that Plaintiff was ineligible, the UCSF liver transplant evaluation committee considered the following factors: (1) medical necessity; (2) history and current substance abuse; (3) compliance with prior treatment recommendations; and (4) ability pay for transplantation and follow-up care. (*Id.*)

Plaintiff's history of drug use significantly impacts his eligibility. On August 9, 2004, Dr. Saab, from UCLA's liver transplant program, testified during his deposition that patients with a history of marijuana use must show three negative toxicology screens before they can be considered for a transplant. (Defs.' Supp. at 2; Pl.'s Supp. at 3.) Those patients actively using marijuana will not be eligible for list placement. (*Id.*) Likewise, UCSF's transplant program excludes patients who use marijuana. (Defs.' Supp. at 3.) Moreover, a UCSF patient with a toxicology screen that is positive for marijuana has to demonstrate negative screens for a year before

he or she would be considered for inclusion on the transplant list. (Defs.' Supp. at 6; Pl.'s Supp. at 3.)

The record shows that Plaintiff's urine tested positive for THC (marijuana) on January 13, 2004 and most recently, on September 17, 2004.[1] (Defs.' Supp. at 1.) Additionally, on January 13, 2004, Dr. Merriman of UCSF noted in his report that Plaintiff was currently smoking cigarettes and had failed to adhere to prior physician recommendations. (Defs.' Supp. at 2; Opp'n Ex A. at AGO–1655.) This too undermines Plaintiff's eligibility, as "some transplant facilities will not consider cigarette smokers as candidates for listing until they have quit." (Pl.'s Supp. at 4.)

Plaintiff argues that because different facilities employ different transplant eligibility criteria, the Court should require Defendants to analyze the criteria from the ten remaining California transplant centers. (Pl.'s Supp. at 3.) Additionally, Plaintiff submits the eligibility factors from several transplant programs. All exclude those who use alcohol or drugs to some degree with various levels of stringency.[2] Additionally, Plaintiff argues that CSP's Alcoholics/Narcotics Anonymous ("AA/NA") program must be expanded and that Plaintiff's failure to regularly participate should not be held against him due to his limited access. (Pl.'s Supp. at 4.)

Defendants counter that CSP provides Plaintiff with an opportunity to attend weekly AA meetings and that Plaintiff maintains a record of his attendance. (Defs.' Supp. Opp'n at 2.) Defendants also assert that UCSF and the other medical centers they contacted evaluate each potential transplant candidate on a case-by-case basis and do not employ a strict list of criteria (Walter's Supp. Decl. at 2.)

On these facts, Plaintiff's transplant eligibility is unclear, although the evidence presented suggests a low likelihood of eligibility at this time. However, based on the eligibility information provided by Plaintiff, it appears as though Plaintiff's contraindications may possibly be resolved in a relatively short time frame, depending on Plaintiff's adherence to the transplant centers' guidelines.

### 3. Security Concerns

UCLA declined to accept Plaintiff as a transplant candidate at least in part because of security issues. (Defs.' Supp. at 6.) In contrast, Dr. Merriman testified that UCSF does accept state prisoners for surgical care. (Defs.' Supp. at 5.) To date, the parties have not presented evidence regarding the policies at other medical facili-

---

1. Plaintiff contends that his positive drug screens result from second-hand marijuana smoke inhalation, and he denies having personally ingested marijuana since he arrived at CSP in 2000. (Reply at 4 n. 2.) The Court declines to make a determination regarding Plaintiff's drug use at this time. Suffice it to say that regardless of the means by which Plaintiff's urine tests become positive for marijuana, its effect on Plaintiff's transplant eligibility from the hospitals' standpoint is the same.

2. St. Vincent Medical Center's liver transplant program prohibits its candidates from participating in "active alcohol or drug abuse," but does not specify what constitutes "active" use. (Pl.'s Supp. Ex. 2.) Stanford University's program lists substance abuse within the last six months as a contraindication to transplant eligibility. (Arnzen's Supp. Decl. Ex. 2.) UC Davis includes active drug or alcohol abuse and noncompliance with medical treatment as absolute contraindications. (Arnzen's Supp. Decl. Ex. 3.) UC Irvine notes that it may perform urine drug screen on potential candidates but has not published the consequences of a positive test result. (Arnzen's Supp. Decl. Ex. 5.) University of Southern California accepts former drug and alcohol abusers who demonstrate abstinence and completion of a formal rehabilitation program. (Arnzen's Supp. Decl. Ex. 6.)

ties regarding inmate patients. As such, there is a moderate showing that security problems will not bar Plaintiff's from being considered for a transplant.

### 4. Costs

Defendants do not argue that costs are the only obstacle, but they do suggest that financial limitations are of significance. Specifically, Defendants suggest that given the prevalence of hepatitis C among the prison population, requiring prisons to pay for inmate liver transplants as a matter of policy will result in exorbitant health care expenses. (Defs.' Supp. at 4.) According to Dr. Merriman, UCSF's average costs associated with performing a single liver transplant are between $125,000 and $500,000.[3] (*Id.*)

Plaintiff counters (1) that budget constraints, as a matter of law, do not excuse failure to provide necessary medical care, and (2) inmates should receive at least the same level of care provided by the state to non-incarcerated, indigent citizens. (Pl.'s Supp. at 6.) In support, Plaintiff cites to *Jones v. Johnson*, where the Ninth Circuit held that denial of treatment due solely to budget constraints evidences deliberate indifference. 781 F.2d 769, 771–72 (1986). Additionally, Plaintiff has submitted evidence showing that Medi–Cal, the state's health care program for low-income residents, covers the costs of liver transplants despite the high costs associated with that level of care. (Pl.'s Supp. at 6.) As such, Plaintiff has made a fairly strong showing that costs alone should not impede his ability to receive necessary medical care.

### B. Possibility of Irreparable Harm

The parties do not dispute the severity of Plaintiff's medical condition. Nor do Defendants deny that the delay to Plain-

tiff's treatment while this case is being litigated could realistically cost Plaintiff his life. Such harm is undeniably irreparable.

■ In a case where indigent residents challenged a county's decision to reduce its number of hospital beds, the Ninth Circuit affirmed the district court's decision to grant the plaintiffs' request for a preliminary injunction, barring the county from going forward with its plan. *Harris v. Bd. of Supervisors*, 366 F.3d 754 (2004) The district court found that the residents would suffer irreparable injury absent a preliminary injunction due to delays in necessary medical treatment and that the likely severe and irreparable harm to plaintiffs outweighed any harm to the county. *Id.* at 759. Consistent with the reasoning in *Harris*, this Court finds that there is far more than a mere possibility of irreparable harm to Plaintiff.

### C. Balance of Hardships

When adjudicating a preliminary injunction motion, the Ninth Circuit expects lower courts to protect physical harm to an individual over monetary costs to government entities. *See Harris*, 366 F.3d at 766 ("[f]aced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983)); and *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir.2004) (affirming preliminary injunction in favor of disabled plaintiffs challenging the county's decision to close specialty medical facility; balance of hardships tipped in favor of plaintiffs, who would be deprived of necessary treatment and suffer increased pain and medical complications).

---

**3.** The risk of dying during transplantation is 1 in 20, and the five-year survival rate for trans-

plant recipients is approximately 70%. (Defs.' Supp. at 4.)

In balancing hardships, courts need not always take the public's interest into account. *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 917 (9th Cir.2003). Here, Plaintiff argues that granting the preliminary injunction serves the public's interest in upholding constitutional norms. (Pl.'s Mem. of P. & A.) Undoubtedly such public concern is present in every case where constitutional claims are raised. However, the public also has an interest in assuring that public funds are appropriately expended.[4] In *Harris,* the court specifically noted that the budgetary impact on other government programs was relatively more speculative than the probability of harm to the plaintiff individuals, whose physical harm was uncertain only in timing and severity. *Harris,* 366 F.3d at 766. As such, the public's interest in prudently and equitably allocating resources did not tip the balance in favor of financial conservation. *Id.*

The Court finds the present situation analogous to cases such as *Harris* and *Rodde,* concerning proposed eliminations of government-sponsored health care services, despite the fact that here a single plaintiff's health and well-being are at stake. Both situations involve the withholding of publicly funded medical treatment from individuals who will certainly suffer physical harm as a result. As such, the Court finds that the balance of hardships tips in Plaintiff's favor.

### D. Conclusion

In conclusion, the Court finds that Plaintiff has demonstrated a high probability of irreparable harm, which offsets a weaker showing of likely success on the merits. Although Plaintiff's potential eligibility for transplant list placement is questionable, the record indicates that (1) a transplant is medically necessary, and (2) that security issues are not certain to interfere with Plaintiff's treatment. Moreover, case law suggests that the high costs associated with the transplant procedure do not preclude success on a deliberate indifference claim. As such, Plaintiff has made a moderate showing that he is likely to succeed on the merits of this case. Additionally, there is legal support for a finding that the hardships weigh more heavily on Plaintiff than on the state. Therefore, the Court finds that Plaintiff has met his burden of persuasion. Accordingly, the Court **GRANTS** Plaintiff's request for a preliminary injunction.

However, the Court finds it appropriate to set the terms of the injunction more narrowly than Plaintiff requests. In his Proposed Order, Plaintiff includes five enumerated items. Items one, two and three would require Defendants to provide Plaintiff with routine physicals at CSP and to comply with all reasonable treatment and dietary prescriptions recommended by Plaintiff's examining physicians. Because the Court has already granted such requests in its September 14, 2004 Preliminary Injunction Order, the Court **DENIES** them as moot. Moreover, as in the prior order, the Court declines to substitute its judgment for that of Plaintiff's health care providers by requiring a minimum examination frequency. (September 14, 2004 Order at 3–4.)

In items four and five, Plaintiff requests that the Court order Defendants to: (1) arrange for transplant evaluations at all the other transplant centers in the state and provide transportation and illicit drug screening to Plaintiff in support of such

---

4. Defendants report that a total of $3,946.21 was spent by the state on Plaintiff's UCLA and

UCSF evaluations. (Opp'n at 20.)

evaluations; (2) work with the transplant facilities to develop a plan that addresses their security concerns and provide the necessary security personnel; and (3) arrange for prompt transplant list placements at all medical centers where Plaintiff is determined to be eligible.

The Court **ORDERS** a modified preliminary injunction as follows:

(1) *Within 30 days* following the date of this Order, Defendants shall contact the ten remaining liver transplant centers in California to determine whether they will accept a prisoner as a transplant candidate—namely UC Davis, California Pacific Medical Center, Stanford Hospital, Loma Linda University Medical Center, St. Vincent Medical Center, University of Southern California, Cedars Sinai Medical Center, UC Irvine, Scripps Green Hospital, and UCSD;

(2) Of those transplant centers willing to accept prisoners, Defendants shall choose the two institutions which are likely to find Plaintiff transplant-eligible in the shortest time frame, taking into account the institutions' eligibility criteria and Plaintiff's medical profile, including his drug use history;[5] and

(3) Defendants shall promptly arrange for Plaintiff to receive complete transplant evaluations at the two facilities they choose, providing all transportation, drug screening, and security necessary to facilitate evaluation and potential transplant list placement.

Should Plaintiff be denied listing at both facilities, Plaintiff may move the Court to amend this Order by presenting the Court with current information regarding his

transplant eligibility factors and demonstrating good cause for requiring Defendants to pursue additional evaluations.

**IT IS SO ORDERED.**

---

**5.** The Court assumes there are two liver transplant programs, aside from UCSF, that are willing to accept prisoners as transplant candidates. Clearly, if no such programs exist, Defendants are excused from complying with this instruction. However, Defendants must make reasonable efforts to address the security concerns of facilities that are hesitant to treat inmates.